IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PETER V. SHELTON,

                Petitioner,

vs.

SCOTT KERNAN, Secretary, California
Department of Corrections and
Rehabilitation,[1]

                Respondent.

No. 2:14-cv-02000-JKS

MEMORANDUM DECISION

Peter V. Shelton, a California state prisoner proceeding *pro se*, filed a Petition for a Writ

of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  At the time he filed his Petition,

Shelton was in the custody of the California Department of Corrections and Rehabilitation and

incarcerated at Folsom State Prison.  It appears that he has been released on supervised parole, as

a search on the Department of Corrections and Rehabilitation's inmate locator website

(http://inmatelocator.cdcr.ca.gov/, Inmate No. AH9967) has no record of him.  Shelton has not

filed a change of address with this Court.  Respondent has answered, and Shelton has not replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On December 17, 2010, Shelton was charged with the attempted murder of Joseph

Davidson (Count 1) and assaulting Davidson with a deadly weapon (Count 2).  As to both

counts, the information alleged that Shelton personally inflicted great bodily injury and, with

regard to the attempted murder count, that Shelton personally used a deadly weapon—a

---

[1]      Because it appears that Shelton has been released from prison but is on post-release supervision, Scott Kernan, Secretary, California Department of Corrections and Rehabilitation, is substituted for L. Romero, former Warden, Folsom State Prison.  FED. R. CIV. P. 25(c).

knife—during the commission of the offense. Shelton pled not guilty and proceeded to a jury trial on May 9, 2011. On direct appeal of his conviction, the California Court of Appeal laid out the following facts underlying this case and the evidence presented at trial:

> [Shelton] and Davidson did not like each other. In 2006, while working as a bartender at the Stockman Club, [Shelton] kicked Davidson out of the bar and convinced the owner to permanently ban him from returning. After being removed from the bar, Davidson challenged [Shelton] to fight him at a park across the street. According to Davidson, rather than follow him across the street, [Shelton] stood in front of the bar and "ran his mouth." On another occasion, Davidson and a friend went to a deli near the Stockman Club. [Shelton] was also there. As Davidson explained: "[Shelton] was running his mouth saying we needed to leave. We need to leave. It's his place. It's his town." [Shelton] then walked outside. Davidson followed, tapped [Shelton] on the shoulder, and slapped him across the face as he turned around. [Shelton] walked away without retaliating.
>
> On August 19, 2009, Davidson, Jason Flatt, Shaun Ross, and Janee McCalister were drinking at another Fair Oaks bar called the Vent. After drinking for a couple of hours, they decided to go back to the apartment Davidson shared with Flatt and Ross. McCalister asked to be driven to the Stockman Club so she could pick up her bicycle. The men agreed. As mentioned, Davidson was banned from entering the Stockman Club. So was Ross. Flatt drove the foursome in his pickup truck and parked in front of the bar. McCalister went inside. Davidson, Flatt, and Ross stood next to the truck.
>
> While Davidson and his roommates waited for McCalister to return with her bicycle, [Shelton] walked out of the Stockman Club. Ross greeted [Shelton] with: "[H]ello, Peaches. How are you doing?" [Shelton] no longer worked at the Stockman Club, but nevertheless informed Davidson and Ross they would "need to leave his bar." [Shelton] was "staring them down" and had one hand at his waistband, "posturing like he had a weapon." Davidson told [Shelton] they "weren't at his bar," explained they were waiting for McCalister, and told him to "get back inside." The conversation became heated. [Shelton] repeated several times Davidson and Ross "need[ed] to leave his bar." Davidson repeated: "[T]his ain't your bar, dude. We are here for a reason and then we are leaving. So leave us alone. Go back inside and leave us alone." Davidson "was getting more and more worked up." Ross told [Shelton] he had "an open-ended offer" to "step over in the park and, you know, if he wanted to continue talking we'd go do something about it." At about this time, McCalister came out of the bar and said she would be staying there. Ross then told Davidson and Flatt: "He doesn't want to fight. He doesn't want to do anything. He just wants to run [his] mouth. Let's get out of here."
>
> As Davidson, Flatt, and Ross were getting into the truck to leave, [Shelton] said: "I'll get you motherfuckers when no one's around." Angered by this threat, Davidson pushed Ross out of his way and rushed [Shelton], pinning him against a wall and punching him in the face. Within seconds, Nazra Bertelli, the Stockman Club's doorman, tackled both Davidson and [Shelton]. Davidson fell on top of [Shelton]. Bertelli was on

top of Davidson and had him in a rear chokehold.  While on the ground, Davidson "felt a sudden, sharp pain in [his] side."  Bertelli then got up and lifted Davidson off of the ground, still holding him in the chokehold.  Davidson was in a "daze" and his eyes were "rolling back in his head."  Seeing that his friend was in trouble, Flatt yelled to Bertelli: "[Y]ou're killing him, man.  You're killing him.  Let him go."  Before Bertelli could do so, [Shelton] got up and lunged at Davidson.  Davidson felt another sharp pain, this time in his chest.  Bertelli then threw Davidson into the side of Flatt's truck.  Davidson staggered upright as blood began to stream down his shirt.  Lifting his shirt, Davidson said to Flatt: "[H]e stuck me, Jay.  The fucker got me."

[Shelton] went back in the Stockman Club and locked the door behind him.  Flatt and Ross helped Davidson into the truck and applied pressure to his stab wounds.  They also restrained Davidson, who wanted to go after [Shelton] for stabbing him.  Law enforcement officers arrived on scene a short time later.  They were unable to locate [Shelton].  Paramedics also arrived and took Davidson to Mercy San Juan Medical Center.  Davidson had two stab wounds.  The first was to Davidson's left hip.  The second was to the left side of the chest, narrowly missing his heart.  Davidson survived his injuries.

[Shelton] called McCalister the day after the stabbing.  McCalister told [Shelton] he was in "a lot of trouble" and she was "going to try to stay out of it."  [Shelton] asked McCalister to tell him where Davidson and his roommates lived.  McCalister answered: "[W]hy do you want to know where they live, Pete? . . .  [Y]ou stabbed Joe.  He almost died.  You won."  [Shelton]  did not respond.

As mentioned, the trial court admitted into evidence testimony concerning specific instances of violent conduct engaged in by [Shelton] about 10 years before he stabbed Davidson in front of the Stockman Club.  We describe this testimony in the discussion that follows.  For purposes of this opinion, we need not describe [Shelton's] evidence.  Suffice it to say [Shelton] did not dispute stabbing Davidson.  Instead, he claimed self-defense.  The jury accepted that [Shelton]  honestly believed in the need to use force against Davidson in order to defend himself, but found either this belief was unreasonable or the amount of force used to defend himself from Davidson's attack was unreasonable. Accordingly, the jury found [Shelton] not guilty of attempted murder and convicted him of attempted voluntary manslaughter on the basis of imperfect self-defense.

*People v. Shelton*, No. C068708, 2013 WL 3778137, at *1-2 (Cal. Ct. App. Jul. 18, 2013).

The jury also found him guilty of assault with a deadly weapon (Count 2).  With regard

to the attempted voluntary manslaughter conviction, the jury found true the personal use of a

deadly weapon allegation, and found the great bodily injury allegation true as to both counts.

The trial court subsequently sentenced Shelton to an aggregate term of 7 years' imprisonment (3

years for Count 1, plus 1 consecutive year for the personal use of a deadly weapon allegation, plus 3 consecutive years for the great bodily injury allegation). The court also imposed an imprisonment term of 3 years for Count 2, plus 3 years for the great bodily injury allegation, both of which were stayed pursuant to California Penal Code § 654.[2]

Through counsel, Shelton appealed his conviction, arguing that: 1) the trial court abused its discretion by admitting testimony evidence concerning specific instances of violent conduct engaged in by Shelton about 10 years before the incident at the Stockman Club; 2) if the trial court did not err in its admission of the evidence, he was denied the effective assistance of counsel because counsel opened the door for the admission of evidence; and 3) the court erred in denying his motion for a mistrial based on the erroneous admission. On July 18, 2013, the California Court of Appeal issued a reasoned, unpublished opinion unanimously affirming the judgment against Shelton. *Shelton*, 2013 WL 3778137, at *7. Shelton petitioned in the California Supreme Court for review, which was denied without comment on October 9, 2013.

Shelton next filed in the California Superior Court a *pro se* petition for habeas relief. In that petition, he again argued that evidence of his prior violent conduct was wrongfully admitted, and also argued that trial counsel was ineffective for persuading him not to testify on his own behalf and for failing to rehabilitate Shelton's character by introducing the character references that were later only presented at sentencing. The superior court denied the petition in an unpublished, reasoned opinion issued on February 11, 2014. Ortega raised the same claims in a

---

[2] Section 654 provides in relevant part that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." CAL. PENAL CODE § 654.

*pro se* habeas petition in the California Court of Appeal, which was summarily denied on September 15, 2011. Shelton raised the same claims in *pro se* habeas petitions in the California Court of Appeal and the California Supreme Court, which were denied without comment on March 27, 2014, and June 25, 2014, respectively.

Shelton then timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on August 14, 2014. *See* 28 U.S.C. § 2244(d)(1)(A). Briefing is now complete, and the case has been reassigned to the undersigned judge for adjudication.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Shelton argues that: 1) trial counsel was ineffective for overriding Shelton's desire to testify; 2) the prosecutor and trial judge committed misconduct by lulling his counsel into being ineffective; 3) the trial court erred in admitting evidence of his past violent conduct; and 4) appellate counsel was ineffective for failing to raise trial counsel's errors on appeal.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication

on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Shelton has not replied to Respondent's answer. The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true." 28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952). Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true. *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

## IV. DISCUSSION

A. <u>Ineffective Assistance of Counsel (Grounds 1, 4)</u>

Shelton first argues that both trial counsel and appellate counsel rendered ineffective assistance of counsel. To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. 668, 687 (1984). A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v.*

*United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95. Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard. *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009). Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Shelton must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

Shelton alleges in Ground 1 that:

> Trial counsel was ineffective when overriding petitioner's desire to testify by convincing him that testifying would be harmful his case, thus denying his constitutional right to testify on his own behalf and denying the right to compulsory process for witnesses on his behalf. Due to these reasons trial counsel rendered himself ineffective and therefore rendered the trial a miscarriage of justice wherein the trial cannot be relied upon as having a just result.

The right of an accused to testify in his own defense is well established and is a "constitutional right of fundamental dimension." *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993); *see Rock v. Arkansas*, 483 U.S. 44, 51 (1987). The right stems from several provisions of the Constitution, including the Fourteenth Amendment's Due Process Clause, the Sixth Amendment's Compulsory Process Clause, and the Fifth Amendment's privilege against self-incrimination. *Rock*, 483 U.S. at 51-52. The right is personal, and "may only be relinquished by the defendant, and the defendant's relinquishment of the right must be knowing and intentional." *Joelson*, 7 F.3d at 177.

However, while waiver of the right to testify must be knowing and voluntary, it need not be explicit. *See id.* Rather, a defendant is "presumed to assent to his attorney's tactical decision not to have him testify." *Id.* "[W]aiver of the right to testify may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so." *Id.* A defendant who wishes to reject his attorney's advice and take the stand may do so "by insisting on testifying, speaking to the court, or discharging his lawyer." *Id.* When a defendant remains "silent in the face of his attorney's decision not to call him as a witness," he waives the right to testify. *United States v. Nohara*, 3 F.3d 1239, 1244 (9th Cir. 1993).

Here, Shelton concedes that he accepted counsel's advice not to testify. The record does not show that Shelton insisted on testifying, and aside from Shelton's own statements in his Petition to the contrary, there is no evidence in the record that trial counsel somehow prevented him from either testifying or speaking to the court about his desire to testify. Thus, the record

supports the superior court's finding on state habeas review that counsel did not unduly coerce Shelton from waiving his right to testify.

In any event, Shelton cannot show prejudice.[3] The declaration Shelton submitted in support of his state habeas petition, which details what Shelton would have said if he had testified, largely mirrors the evidence elicited at trial. The only difference is Shelton's statement, made in the habeas petition declaration, that he thought the victim may have had a knife. But the jury convicted Shelton of the lesser included offense of attempted voluntary manslaughter, which meant that it concluded that Shelton honestly believed in the need to use force against the victim but that either the belief or the amount of force used was unreasonable. Shelton provides no reason to believe that his testimony would have led to a different result, given that the jury's verdict appears to be consistent with the substance of Shelton's proposed testimony and there was no other evidence that the victim did indeed have a knife. And because Shelton cannot show that trial counsel was ineffective, he likewise cannot prevail on his claim that appellate counsel was ineffective for failing to raise trial counsel's alleged ineffectiveness. *See Lockhart*

---

[3] Shelton's claim alleges only that his counsel was ineffective for failing to secure his right to testify, which is subject to the prejudice prong of *Strickland.* Shelton does not contend that the trial court deprived him of his right to testify. Where a federal criminal defendant is denied his constitutional right to testify, the Ninth Circuit has suggested, although not decided, that such denial may constitute structural error under which error may not be deemed harmless. *See United States v. Gillenwater*, 717 F.3d 1070, 1083 (9th Cir. 2013) (declining to decide whether the denial of the right to testify constitutes structural error after concluding that the denial was not harmless in that case); *but see United States v. Kowalczyk*, 805 F.3d 847, 860 (9th Cir. 2015) (finding harmless district court's refusal to allow defendant to speak at a hearing on supplemental briefing). Even construing Shelton's Petition to raise a claim that he was denied his constitutional right to testify, Shelton cannot prevail because, as discussed above, his silence waived his right to testify. And in any event, Shelton's right to testify claim would still fail on *Brecht* harmless error review. *See Parle v. Runnels*, 387 F.3d 1030, 1042-45 (9th Cir. 2004) (applying *Brecht* harmless error test to § 2254 claim that state trial court infringed upon petitioner's right to testify).

*v. Fretwell*, 506 U.S. 364, 374 (1993) (O'Connor, J., concurring) (failing to raise a meritless objection cannot constitute prejudice under a *Strickland* ineffective assistance of counsel claim). Shelton is therefore not entitled to relief on Ground 4 either.

B.      Prosecutorial and Judicial Misconduct (Ground 2)

Shelton next contends that "[t]he trial judge and prosecution were in misconduct error when they used procedural tactics to lull the defense into denying the petitioner his right to testify and caused confusion in evidentiary rulings[,] leaving the defense counsel in a position of incompetence and ineffective assistance of petitioner." Shelton raised this claim in his state habeas petition. The superior court denied the claim with citation to *In re Dixon*, 264 P.2d 513, 514 (Cal. 1953), which indicates that the state court found it to be barred because it could have been, but was not, raised on direct appeal.

Respondent urges this Court to likewise find the claim procedurally barred on federal habeas review. Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). The Ninth Circuit has not explicitly found that a *Dixon* default is an independent and adequate state law ground, but it has indicated that it is likely to do so with respect to the time period at issue here. *See Bennett v. Mueller*, 322 F.3d 573, 580-86 (9th Cir. 2003) (suggesting in dicta that *Dixon* rule would constitute an independent and adequate state-law ground when applied after the California Supreme Court's 1998 decision in *In re Robbins*, 959 P.2d 311 (Cal. 1998)); *see also Flores v. Roe*, 228 F. App'x 690, 691 (9th Cir. 2007)[4] (finding claim procedurally barred

_____

[4]      Cited for persuasive value pursuant to Ninth Circuit Rule 36-3.

11

based on *Dixon* bar); *cf. Park v. California*, 202 F.3d 1146, 1152-53 (9th Cir. 2000) (holding that *Dixon* bar was not independent state law ground prior to *Robbins*). Some courts in this district have accordingly concluded that habeas review is foreclosed when the petitioner has failed to place the adequacy of the *Dixon* rule at issue and has not shown cause and prejudice or that a miscarriage of justice would result if the claim were not heard. *See, e.g., Stribling v. Grounds*, No. 12-cv-3084, 2013 WL 5817668, at *4-5 (E.D. Cal. Oct. 29, 2013); *Cantrell v. Evans*, No. 07-cv-1440, 2010 WL 1170063, at *13-14 (E.D. Cal. Mar. 24, 2010).

In any event, Shelton's arguments are without merit. To successfully raise a claim cognizable on habeas review based on a prosecutor's comments at trial, a petitioner must demonstrate that the prosecutor's comments "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Under this standard, only egregious prosecutorial misconduct can give rise to a constitutional claim. *See Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995). Likewise, a petitioner claiming judicial misconduct must overcome a "presumption of honesty and integrity" on the part of the judge. *See Withrow v. Larkin*, 421 U.S. 35, 47 (1975). A claim of judicial bias based on improper conduct by a state judge in the context of federal habeas review does not simply require that the federal court determine whether the state judge's conduct was improper; rather, the question is whether the state judge's conduct "rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995) (citations omitted).

Shelton fails to satisfy these standards here with respect to either the prosecutor or the trial judge. The substance of Shelton's complaint appears to be based on the Court of Appeal's finding on direct appeal that the court erred when it ruled that defense counsel had opened the door to the admission of Shelton's past violent conduct, which is addressed with respect to Ground 3, *infra*. However, a claim of judicial error does not, by itself, establish judicial misconduct. Rather, "[i]n the absence of any evidence of some extrajudicial source of bias or partiality, neither adverse rulings nor impatient remarks are generally sufficient to overcome the presumption of judicial integrity, even if those remarks are 'critical or disapproving of, or even hostile to, counsel, the parties, or their cases.'" *Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir. 2008) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)). Shelton provides no other support, and his judicial misconduct claim must be denied.

Shelton appears to argue that the prosecutor committed misconduct because he initially argued by email to the trial court, which Shelton argues was an improper ex parte communication, that defense counsel had opened the door to the admission. The record shows, however, that the email at issue was sent by the prosecutor to both the trial court and defense counsel. Shelton therefore fails to show that the prosecutor committed misconduct either.

C.      Erroneous Admission of Past Violent Conduct (Ground 3)

Finally, Shelton claims that the trial court violated his due process rights by erroneously admitting into evidence testimony concerning specific acts of violent conduct that Shelton engaged in about 10 years before the charged incident. On direct appeal, the Court of Appeal described the following facts underlying this claim:

> Prior to trial, the prosecution moved to exclude evidence concerning the reason [Shelton] kicked Davidson out of the Stockman Club in 2006, *i.e.*, fighting with another

13

patron.  Defense counsel argued this evidence was "important to establish . . . the beginning of the longstanding relationship between [Davidson] and [Shelton] and the basis for . . . the aggression on the part of [Davidson] towards [Shelton] as . . .  this was the catalyst in terms of how the aggravated relationship began between the two." Defense counsel also stated he believed Davidson made a threat to [Shelton] while being kicked out of the bar and argued [Shelton] "believed that Davidson was coming back to make good on that threat" the night of the stabbing.  Even though making a threat against [Shelton] while being kicked out of the Stockman Club could be considered evidence of Davidson's violent character, defense counsel made clear that this evidence was not being offered to prove Davidson acted in conformity with that character the night of the stabbing.  Instead, it was offered under section 1101, subdivision (b), to prove [Shelton's] state of mind the night of the stabbing and Davidson's motive for attacking [Shelton] that night.  The trial court ruled defense counsel could elicit testimony concerning any threat made by Davidson while being kicked out of the bar.  The trial court also explained that evidence Davidson was kicked out of the bar for fighting with another patron would be admissible under section 1103, subdivision (a)(1), to prove he acted in conformity with his violent character the night of the stabbing, but warned defense counsel this would open the door to the prosecution to elicit evidence of [Shelton's] violent character.

The prosecution also moved to introduce certain incidents of [Shelton's] violent conduct under section 1101, subdivision (b).  Specifically, the prosecution sought to elicit testimony concerning an incident in 2000 in which [Shelton] attempted to stab a former roommate with a knife after they got into a fight over rent.[FN3]  The prosecution argued the evidence was admissible under section 1101, subdivision (b), to prove [Shelton's] intent the night of the stabbing.  Defense counsel argued evidence of this prior incident was not admissible under section 1101, subdivision (b), to prove intent because the "circumstances in that case are very, very different from the circumstances in this case," but acknowledged it "would be appropriate" to admit this evidence under section 1103, subdivision (b), if [Shelton] were to introduce evidence of Davidson's violent character under section 1103, subdivision (a)(1).  The trial court agreed with defense counsel, ruled the evidence inadmissible under section 1101, subdivision (b), and warned defense counsel it would be admissible under section 1103 should he introduce evidence of Davidson's violent character.  The prosecutor then informed the trial court about another incident that also occurred in 2000, about two weeks prior to the knife assault on [Shelton's] former roommate, in which [Shelton] held two guns to his former girlfriend's head.  The prosecutor asked that this incident also be admitted into evidence, as well as evidence of [Shelton's] "reputation for being intimidating, scary, threatening to people in the community," if defense counsel opened the door to character evidence under section 1103.  The trial court agreed.

> FN3.  The prosecution also sought to elicit testimony concerning an incident in 2009 in which [Shelton] hit a man in the head with a gun in front of the Stockman Club after telling the man he was not allowed near the bar. However, the prosecution did not introduce evidence of this incident at trial.  Accordingly, we shall not mention it further.

Defense counsel then asked for clarification regarding what evidence he could adduce without opening the door to the character evidence he did not want admitted against [Shelton]. Defense counsel explained his position: "If I'm eliciting information from the witnesses about specific instances between [Davidson] and [Shelton], my feeling is I'm not opening the door because it's not reputation, it's not opinion. And though it may be a specific incident, it's not a specific incident to show propensity for violence." The trial court agreed: "No, it's showing motive." The prosecutor objected: "It doesn't matter if [defense counsel's] intent is to show motive. But if evidence is introduced by the defense that is a prior instance of violence by the victim, then according to [section] 1103 the door has been opened." The trial court disagreed: "That's not necessarily true because, let's face it, we do give jurors an instruction that tells them that certain evidence was admitted for a limited purpose. [¶] And, in fact, what we can do is we can specify why the evidence is being used. We can tell the jurors, for example, this evidence is being used . . . by the defense to demonstrate the presence or absence of motive, for example." The trial court did agree with the prosecution that if defense counsel introduced evidence concerning violence between Davidson and someone other than [Shelton], the door would be opened under section 1103.

The prosecutor questioned Davidson about his prior confrontations with [Shelton] during direct examination. As mentioned, Davidson testified that [Shelton] worked as a bartender at the Stockman Club in 2006. [Shelton] kicked Davidson out of the bar and convinced the owner to permanently ban him from returning. After being removed from the bar, Davidson challenged [Shelton] to follow him across the street to fight him at the park. Instead, [Shelton] stood in front of the bar and "ran his mouth." On another occasion, Davidson and a friend went to a deli that was near the Stockman Club. [Shelton] was also there. He "was running his mouth" and told Davidson to leave because: "It's his place. It's his town." When [Shelton] walked outside, Davidson followed, tapped him on the shoulder, and slapped him across the face. [Shelton] walked away.

During cross-examination, defense counsel also asked Davidson about these incidents. Then defense counsel asked two sets of questions that caused the trial court to conclude evidence of Davidson's violent character was being offered to show conduct in conformity with that character, opening the door to the admission of such evidence against defendant under section 1103. First, defense counsel asked Davidson whether he had been trained in hand to hand combat during his military service. Davidson responded: "The funny part is I had [kitchen duty] that day." Second, defense counsel asked Davidson whether he was angry after being stabbed by [Shelton]. Davidson answered: "Yup." Defense counsel then asked Davidson whether he wanted to pursue [Shelton]. Davidson responded: "He has just tried to kill me. So yes." Defense counsel asked Davidson whether he was afraid. Davidson answered: "I ain't afraid of nobody." Defense counsel then asked: "And you would have done anything you could to go after [defendant] that you physically could; right?" Davidson responded: "If I could have." Finally, defense counsel asked: "You wanted to kill [Shelton]?" Davidson answered: "I wanted to—wanted to go get him. I wanted to get him and break every bone in his body

and make him pay for what he just did to me, yes. [¶] Kill, no. [¶] He didn't hurt—he didn't harm my kid. [¶] I wouldn't kill anybody unless they harmed my kid."

Before resting its case, the prosecution moved the trial court to reconsider its prior ruling prohibiting evidence of [Shelton's] character for violence. After entertaining argument on the motion, the trial court granted the prosecution's motion. The trial court explained: "[T]he case law really doesn't cover this particular area where you have prior incidents involving the defendant and the victim as opposed to the victim and others to establish character evidence. [¶] Now, my ruling was based on the fact that if [Shelton] were aware of these incidents and aware of things occurring that it goes towards his state of mind and the reasonableness of his response to an attack by the victim. So that's why I allowed it—I allowed it in. [¶] And to be quite frank the case law seems to suggest that perhaps my ruling was wrong. [¶] Now, I'm willing to stick with my ruling. [¶] The problem that I have here is this. I think the testimony has gone further afield than that." Addressing defense counsel's questions concerning Davidson's state of mind after the stabbing, the trial court explained: "The only argument that could be made in regards to that evidence that happened after the incident is that—look. Look at this—look at [Davidson] and look at the steps that he would take to go after this man. He wanted [to] go after [Shelton] after he had been stabbed to break every single bone in his body. That is character evidence." Addressing defense counsel's question concerning combat training, the trial court stated: "Counsel asked the victim didn't he have hand to hand combat in the army? And, you know, quite frankly—and I—counsel kind of left it there—didn't elaborate on it. And I think counsel kind of knew maybe I'm getting in some murky areas here and I'm kind of running afield of maybe the court's ruling." The trial court considered Davidson's statement that he missed combat training because he had kitchen duty to be "very flip and very cavalier." The trial court explained: "There is only one way to term that evidence [sic] is that this guy knows how to use his hands. This guy knows how to, you know, fight people hand to hand. [¶] And that would show, you know, sort of an attenuated—because not every person in the army who learns hand to hand is—is—is a violent person. But in the context of this particular victim it certainly paints a picture of him as being a violent person and having the character traits for violence."

Defense counsel then moved for a mistrial and argued he had not violated the trial court's directions with respect to opening the door to evidence of defendant's violent character. The trial court denied the motion and explained: "I tried to be very, very fine and very precise with the evidence I was going to allow in to go towards your client's state of mind. And this evidence went far afield. The army evidence was far afield. Moreover the evidence of—although it is evidence of this incident [sic]. But it wasn't evidence known to [Shelton]. It just paints the picture of Davidson violently, you know, going after him."

When the prosecution resumed its case, Sarah Harris was called to testify. Harris testified about certain incidents that happened in 2000 when she shared an apartment with her boyfriend Brody, [Shelton], and [Shelton's] girlfriend Melissa. Harris witnessed [Shelton] "push Melissa" and "smack her quite hard." [Shelton] would threaten people when "he didn't get his way." These threats included "beating people up, shooting

people, stabbing people." He "would get angered very easily about little things. Get very frustrated very easily." During this time period, [Shelton] called himself "Tigger" and would often refer to himself in the third person, telling people: "[']['][Y]ou don't want to mess with Tigger or he'll fuck you up.[']" One morning, Harris awoke to the sound of "the top rail of a pistol sliding back." The sound came from the hallway outside her bedroom. As she sat up in bed, she heard Melissa scream. Harris then went into the living room and saw Melissa lying on the couch "with her hands up trying to hold [Shelton] back. [¶] And he was literally standing on the couch over her with two pistols at her head." [Shelton] was "[s]creaming at her—something about she slept with his best friend and she is going to die and he can't believe she did this to him." As Harris explained: "I stood in the hallway for about 15 seconds trying to decide what to do. [¶] I very slowly walk over. I put my arms on top of his arms and told him look. You don't want to do this. Just put them down. [¶] He willingly started pulling his arms down. I had to take the guns out of his hands. It took about a good two minutes to get that done."

Two weeks later, [Shelton] and Brody got into an argument over rent money. The argument turned into a fist fight. During the fight, [Shelton] pulled a knife. Harris described "Brody being bent over the back of the couch and he was bent over sideways and he was trying to hit [Shelton] with one hand and trying to hold him back with the other. And [Shelton] did have a knife and was trying to stab him in the kidney." Harris intervened and grabbed [Shelton's] arm as he tried to stab her boyfriend. She managed to take the knife out of [Shelton's] hand, but not before Brody suffered two knife wounds. [Shelton] and Brody continued to fight for another 15 to 20 minutes. After the fight, as [Shelton] was leaving the apartment, Harris told him she would be calling the police. [Shelton] responded: "I'll fucking kill you if you call the police."

*Shelton*, 2013 WL 3778137, at *3-5.

The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). The Supreme Court has further made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence. *Estelle*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

The erroneous admission of evidence does not provide a basis for federal habeas relief unless it rendered the trial fundamentally unfair in violation of due process. *Holley v.*

*Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). Evidence violates due process only if "there are no permissible inferences the jury may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (emphasis omitted). A writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'" *Mancuso v. Olivarez*, 292 F.3d 939, 956 (9th Cir. 2002) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983)).

In considering this claim on direct appeal, the Court of Appeal concluded that Shelton forfeited his claim that the admission violated his constitutional rights by failing to raise that claim before the trial court. *Shelton*, 2013 WL 3778137, at *3 n.2 ("[Shelton's] contention that the admission of evidence of his prior violent conduct under Evidence Code section 1103, subdivision (b), violated his constitutional right to a fair trial is forfeited because it was not raised in the trial court. (citation omitted)). While the appellate court determined that it could not conclude that the trial court's ground rules with respect to defense counsel eliciting evidence of Davidson's violent character "was an abuse of the discretion the trial court possesses in evidentiary matters," it agreed with that the trial court "abused its discretion by ruling defense counsel violated the agreement concerning admission of [Shelton's] prior relationship with Davidson, thereby opening the door to evidence of [Shelton's] prior violent conduct." *Id.* at *8. The appellate court further agreed that the admitted evidence was "damaging." *Id.* at *9. It nonetheless concluded that the error in admitting the evidence was harmless beyond a reasonable doubt:

> In order to find prejudice, we must find a reasonable probability the error affected the verdict. On this record, there is no such probability. [Shelton] did not dispute

18

stabbing Davidson. Instead, he claimed self-defense. The jury accepted that [Shelton] honestly believed in the need to use force against Davidson in order to defend himself, but found either this belief was unreasonable or the amount of force used to defend himself from Davidson's attack was unreasonable. Accordingly, the jury found [Shelton] not guilty of attempted murder and convicted him of attempted voluntary manslaughter on the basis of imperfect self-defense. There is no reasonable probability that had the challenged evidence been excluded, the jury would have found it to be reasonable for [Shelton] to pull out a knife and stab Davidson twice, both times while Davidson was being restrained by Bertelli, the Stockman Club's six-foot one-inch, 300–pound doorman. Moreover, had [Shelton] preserved for review his contention that admission of the challenged evidence violated his constitutional right to a fair trial, we would also conclude admission of this evidence was harmless beyond a reasonable doubt.

*Id.* (citations omitted).

As an initial matter, because the state appellate court found Shelton's due process claim forfeited under California's contemporaneous objection rule, *Shelton*, 2013 WL 3778137, at *3 n.2 , the claim is procedurally defaulted from federal habeas review, *Coleman*, 501 U.S. at 729-30. The Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in affirming denial of a federal habeas petition on grounds of procedural default where there was a complete failure to object at trial. *See, e.g.*, *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004). Because the state appellate court held that the claim was thereby forfeited under California's contemporaneous objection rule, the claim may be deemed procedurally defaulted on federal habeas review.

Moreover, Shelton cannot show that the admission violates federal due process. "The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process." *Holley*, 568 F.3d at 1101 (9th Cir. 2009). "Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence

constitutes a due process violation sufficient to warrant issuance of the writ." *Id.* (citing

*Williams*, 529 U.S. at 375). Indeed, the United State Supreme Court has left open the question of

whether state law would violate the Due Process Clause if it permitted the use of prior crimes

evidence to show propensity to commit a charged crime. *Estelle*, 502 U.S. at 75 n.5 ("[W]e

express no opinion on whether a state law would violate the Due Process Clause if it permitted

the use of 'prior crimes' evidence to show propensity to commit a charged crime."); *Mejia v.*

*Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008). As such, the Ninth Circuit has routinely found

federal habeas relief to be foreclosed by § 2254(d)(1) for claims challenging the admission of

evidence of prior bad acts or crimes. *See, e.g., Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th

Cir. 2008); *Alberni v. McDaniel*, 458 F.3d 860, 866 (9th Cir. 2006). Lacking any clearly

established Supreme Court authority prohibiting admission of such evidence, it cannot be

concluded that the appellate court's ruling contravened or unreasonably applied federal law.

*Carey*, 549 U.S. at 77 (noting that, where the Supreme Court has not adequately addressed a

claim, a federal court cannot find a state court ruling unreasonable).

　　　　While the Court is certainly troubled by what the Court of Appeals determined to be an

"abuse of discretion," the trial court's error does not warrant relief here. Although the Ninth

Circuit has suggested that an abuse of discretion may also amount to a constitutional violation,

*see Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc), the Supreme Court has never

held that abuse of discretion is an appropriate basis for granting federal habeas relief.[5] Indeed,

---

　　　　　[5]　　　At one time, the Ninth Circuit viewed a state court ruling to be "objectively
unreasonable" if it amounted to a clear error. *Van Tran v. Lindsey*, 212 F.3d 1143, 1152-54 (9th
Cir. 2000). This is the test the Ninth Circuit uses in reviewing a trial court decision under the
abuse of discretion standard. *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012) (en
banc). The Supreme Court noted *Van Tran's* statement of the test and expressly rejected it as

quite to the contrary, the Supreme Court has strongly suggested that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not. *Renico v. Lett*, 559 U.S. 766, 772-73 (2010) ("It is not even whether it was an abuse of discretion for her to have done so–the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law."" (quoting § 2254(d)(1))).

Furthermore,"a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." *See Fry v. Pliler*, 551 U.S. 112, 119 (2007). As discussed by the Court of Appeal, given the jury's verdict and the evidence against Shelton in the record, the Court does not find unreasonable the appellate court's determination that the admission of evidence of other acts of violation was not prejudicial. *See Ponce v. Felker*, 606 F.3d 596, 606 (9th Cir. 2010) (on habeas review, determining that where there was "weighty evidence against Petitioner independent of" the erroneously-admitted statements, "it was not unreasonable for the state courts to determine that the additional testimony . . . did not have a 'substantial and injurious effect or influence in determining the jury's verdict'" (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993))). Accordingly, Shelton cannot prevail on his evidentiary claim.

## V. CONCLUSION AND ORDER

Shelton is not entitled to relief on any ground raised in his Petition.

---

inappropriate under the AEDPA. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (clear error standard is insufficiently deferential to state courts).

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: June 21, 2017.

    /s/James K. Singleton, Jr.    
JAMES K. SINGLETON, JR.
Senior United States District Judge
